Company of New York. I would ask that I be allowed to reserve three minutes for rebuttal. Arthur Levasser, appearing on behalf of the appellant Reliastar Life Insurance Company of New York. I would ask that I be allowed to reserve three minutes for rebuttal. This is an appeal from the grant of a motion for summary judgment and the denial of my motion or our motion for summary judgment. So the review is de novo. In this case, I would urge the court to really take a look at and exercise this de novo review because Judge Botanic, the lower court judge who handled this case, simply missed the law, missed the facts, and did not get it right at all. The real key issue and the thing that is not in dispute is that the insurance company in this case absolutely unequivocally was misled at the very outset of its underwriting process by false statements made to it regarding the nature of the business relationship between Mr. Siren. It was proposed to take an insurance policy out on Mr. Ianni's life with Mr. Siren being the beneficiary and the owner of the policy. And at the time, Lee Churchill, the agent, contacted the underwriting department at ING and inquired about the possibility of getting an insurance policy to secure, in effect. He was told that we'll need some information about the nature of the relationship between these parties, what's their business relationship. So a letter goes from Churchill, the agent, to the insurance company, flat out says... To get to sort of the crux of this, the misrepresentations you complain about did not occur in connection with the particular policy that we're concerned with in this case, correct? It's incorrect, Your Honor. Well, now, it may have been part of a course of conduct. Which misrepresentations do you complain about that related to the application for this particular policy? This particular policy was a $7.2 million policy. The reason it was $7.2... That's not what I... Okay. What I ask is the misrepresentation. The misrepresentation is that there is a... These loans are performing, paying 12% per annum to Mr. Siren. At what point in time was that information given? On June 2nd. And then... The policy app was submitted June 30th. The information on insurable interest... Remind me of the time frame of the earlier policy that was eventually canceled or not taken. Mr. Churchill submitted information explaining the relationship on June 2nd. On June 14th, an application for the first policy was submitted. So all of the... I'm correct when I ask you that all of the information that's claimed to be a misrepresentation occurred prior to the first policy issuance, correct? It occurred prior to either policy. Well, right. Correct. And then there was the second policy. And while you seek to claim the benefits of misrepresentations that were arguably made prior to the issuance of the first policy, right? Prior to the issuance of either policy, before either policy was applied for, they came to the insurance company and said, we'd like to get this policy. That's a fact. It's a factual matter. I'm correct, right? All the fraud took place, all the misrepresentations took place before the applications were submitted, but they had to do with the amount of the insurance that was being applied for, why it was being applied for. And they falsely represented the nature of the relationship between the parties, which was key to the entire decision of the company to issue any policy. There's one company issued one, another company issued the other. The same underwriter underwrote both policies and used this information as part of her decision-making in underwriting the second policy as well as the first policy. That may be my question related to the timeframe. Well, the information came in. The fraud occurred in terms of time on June 2nd. The first application came in on June 14th, the second application on June 30th. But was it false? There's no question the information was false. They falsely represented that this was an ongoing loan that was paying basically $90,000 a month, 12% interest on $9 million. That's $90,000 a month. He hadn't been paid a nickel. He'd started a lawsuit. He was holding a consent judgment for $20 million that was to be entered upon default, and he'd actually defaulted in the first two payments on the consent judgment before this June 2nd false representation was made. So to suggest that the company was not misled is completely... Relia Star's interest in selling this policy is that the premiums will be paid, and I understand the interest in the health of the insured. No? They're interested in knowing that the person that's going to be the beneficiary on this is really interested in the person whose life is being insured, that they have an interest in making sure that person's better off by having them be alive and making these $90,000 a month payments than they would be dead and getting the insurance proceeds. The whole idea is you can't have a gambling contract, and here what you have is a situation where they told the company that this is a normal business relationship. Stop and listen to it. Slow down. Stop. Listen. Listen to the judge's question. You're excited about it, but you need to listen. Slow down just a bit. The interest is the insurer is interested in premiums. The insurer is interested in deciding whether or not to assume risk. There's where I'm missing it, your point. The risk that the wagerer, let's take the worst case, the wagerer won't pay the premiums, and that's who you expected to pay. No, no, that's not the wagering issue at all. It's got nothing to do with the payment of premiums. It's got to do with does the person have a legitimate reason to be paid insurance. Why is that important? That's the question of insurable interest, and the company does not want to. The legitimacy of the insurable interest, this man had what he viewed was an insurable interest. This fellow owes him tons of money, and he's going to insure his life. And the company says, tell us about the business relationship, and they completely misrepresent what the business relationship is. Here's where I'm kind of falling down a little bit. It goes, I think, to what you're talking about, the underwriting. It's the underwriting issue. The underwriting aspect of this thing. But there's no question that the deceased owed the beneficiary money, right? There's no question he owed him money, but what was represented in the company was a normal business relationship, not what the truth was. And the truth, the company says, had we known the truth, we would not have issued. What difference does that make for insurable interest when everybody knew that they were getting the insurance sort of to back up the loan? Because the company was told it was a performing loan. At the time that this letter was written, the fact is that there hadn't been a payment made. I understand what you're saying is a deceit. That isn't what I asked. I said, what difference does it make? Because the company would not have issued the policy. Why? Because they would have not considered it to be sufficient of an interest for their policy to be issued. Why? He still owes the money. He still owes the money, but he has no chance. There is no possibility he's going to actually. It's not a performing loan. What difference does that make? Why would the insurance company care if he actually gets paid or not? The insurance company wants to know that the beneficiary has an interest in the continued life of the insured and is not engaged in a gambling contract. Here, the only way that this guy was going to get his money was. . . Would the insured, if that was true, have some kind of declining policy? Every payment you make, we get to subtract a certain amount from what's due? The company would only insure up to a certain percentage of the loan for the same reason. They're not going to insure 100 percent because then. . . That isn't your argument, though. I'm trying to respond to your question. Would a company insure 100 percent? No, they said flat out we won't insure 100 percent. Why? Think about it. Why won't you? Because we don't want it to be better for you, for the guy to die, than for him to be alive. I understand. That's the whole point. They can insure more, but that doesn't really answer my question. If the whole aspect of this is we want to make sure you pay the loan, that doesn't defeat the insurable interest in the future while the policy would still be in effect. The question isn't we want to make sure you're going to repay the loan. The question, when they decide whether to issue a policy or not, is the person who's going to receive these proceeds got more interest? Is he better off if the insured lives, or is he going to be better off if he dies? I want to pursue that further. That concern is because they'll kill him? Not because they'll kill him, but because is he better off? It's a gambling contract at that point, and they won't assume that risk. That's where I can't follow you. It's still a debt. They insure him because they know he has a debt. Then he defaults, and you say, well, you've lost your insurable interest. No, no, no. They didn't tell him that there had been a lawsuit and there was a consent judgment and that there was no payments on the first $3 million that were supposed to be paid before this letter went out. They said this is a performing loan. My problem is, rather than you just yell at us so much, how does it change the risks they're taking? Because the company doesn't have the confidence that this is a good risk to assume. Why? If he's in good health and he can live the term, the insurable interest is between the two live people. It only becomes a problem when he dies, and he could die of anything. That's true. Even if they had a perfect insurance. Was this insurance company willing to assume this risk? They assumed the risk based on the facts they were told, but they would not have assumed the risk based on the true facts. Let me just say, you know, slow down, and if a judge is talking, you should stop talking. You shouldn't try to talk over us. Just calm yourself enough to let the judges figure out what we need to know about the case. I know my time is running out, and I am trying to articulate things. Okay. Now, I think Judge Sir Heinrich might have been trying to ask you something. I guess you say, well, if they had known he wasn't paying his loan, we wouldn't have insured him. That's correct. Why? Because they wanted to make sure that, well, they were told that this was a performing loan, and they wanted to make sure that the person has more interest, that they're better off if he lives than if he dies, because if it's the other way around, then they perceive it as being a family contract. Well, I could see that if he was very unhealthy and they didn't tell you about his health, but this has nothing to do with whether each side paying the premium or anything else. It's judged from the standpoint of the insured. That's the law. It's up to the insurance company to decide whether they want to assume a risk or not, and the company and the unrebutted affidavit of mis- Does the insured have any duty to do independent investigation? The insurance company has no duty to do an independent investigation. Were there underwriting purposes? Absolutely not. The law is clear on that, and they're entirely reliant on statements made. They relied on the facts that were given to them. Those facts were admittedly false, and the affidavit of Mr. Vose flat out says, had we known the true facts, we as an insurance company, that's not the kind of risk we want to assume. Now, and that's perfect. The law on that subject is very clear. It's up to the insurance company to decide whether they want to assume a risk or not. You'll have your rebuttal time. Thank you. Weiss? Weiss? It's pronounced Weiss. I don't know how to spell it, or my parents don't know how to spell it, or I can't pronounce one or the other, but my name is Michael Weiss. I'm from Law Firm of Howard and Howard. This is a very simple case despite the brief. The policy states crystal clearly, page 7, no statement, none, will be used to deny a claim unless it is in the application. That's it. They have admitted there is no false statement in the application. This Churchill letter, Mr. Churchill dealt with Denver, Security Life of Denver, owned by ING, but Security Life of Denver. He sent nothing to the company that issued the policy, ReliStar. He didn't send them a thing. And the best way to tell what ReliStar relied upon is you look at their underwriting file, which we attached in reference to one of our briefs, and it actually says underwriting file from the policy number at issue. And Mr. Churchill's letter is not in that pile. It's not in the underwriting file. They didn't rely upon it. It happens to be in the underwriting file for the policy that was not taken with a different company. It's simply not there. But even if they did have it in there, their own contract, which you have to, their contract is a contract. It says it must be in the application. The letter's not in the application. It just isn't. They lose for that reason alone. To try to answer some of the questions you were asking, my brother counsel, they're not guaranteeing the debt. This is a life insurance policy, his life. They have page after page after page of medical questions. They never ask if the debt is performing. We didn't lie about anything. And even if you go to fraud, let's just talk about fraud for 10 seconds. Even if there is fraud, there isn't. Read their policy again, the incontestability provision. We may contest your policy at any time if it's procured by fraud. It means they can contest any time they want. But the same sentence continues. We will base any contest, in other words, we can contest, only on a statement made in your application. So, again, is there anything in the application? And we asked Diane Yellen. She crystal clearly said there is not a single misrepresentation in the application. Is it in a deposition of an underwriter? She's the person in charge of this loan completely. There is not a single. I'm sorry, what? What does that mean, to be in charge of the loan? What did she tell you her title was or her duties? Stop loss examiner. She's trying to stop a loss. But she's the person, according to her own testimony. She's in charge of the loan or she's in charge of the policy? She's in charge. She's the person who's deciding not to pay this loan. She's the only person at ReliSTAR who was deposed. She's the person deciding not to pay on the policy. Correct. But still, she admitted in deciding not to pay on the policy. There's not a single false statement in the application. Her testimony is binding. Did anybody else testify that there is something false in the application? No. No one testified there's something false in the application. Even Ms. Travose, who had nothing to do with underwriting. Does she agree that it had to be in the? That's what the policy, yes. She does say that. She doesn't tell you that. She doesn't say differently. The policy says it in more than one place. And not only the policy, the law says it. The statute of the state of Michigan is also clear. Not only does it have to be in the application, but the statute says it also has to be material. And whether or not a loan is paying interest is simply not material to someone's health insurance policy. It's not a wealth insurance policy. It's a health insurance policy. So the law in the state of Michigan also says it has to be in the application and also says it must be material. And it simply isn't material. So, I mean, you lose so many different ways, it's not funny. The statute, so that's a third way. I don't know how many different ways this case can possibly be decided in our favor, but there's just more than you can possibly say. And here's what Diane Yell said. I'll read you the exact quote. I think we've covered this, but we'll do this one more time. Are you aware of any statements made in a June 30th application that are not accurate? No. You're not aware of any statements that are not accurate, correct? Right. That was crystal clear. That was unequivocal. That's binding on ReliSTAR. Their contract is binding on ReliSTAR. And talking about an insurable interest, the law is also clear on insurable interest. It's determined at the time the loan, that the application is made, that the policy is made. Every single case cited anywhere, both from the United States Supreme Court back to the 1800s, to this court recently, to every state of Michigan court, every case cited in every brief, says there is no doubt that a creditor has an insurable interest in the debtor. In fact, the United States Supreme Court said a creditor has an insurable interest in the debtor, even if the debtor is in default. How do you address counsel's argument that this is a void, this policy should be voided as a wagering? Wagering is whether or not there's an insurable interest. And there is an insurable interest. Slow it down if you might. What did you say in that sentence? I'm sorry. The reason why you look at whether it's a wagering contract is to determine whether there is an insurable interest. If there is no insurable interest, then it is a wagering contract. If there is an insurable interest, it's not. An insurable interest is whether the beneficiary has a reason to want the person to stay alive. In this case, we have $9 million worth of reasons why we want this man to stay alive, to pay back his debt. And the debt was actually higher. As much as he wasn't paying. The law is clear. Again, the United States Supreme Court said even if he's in default, there's still an insurable interest. We cited the cases more than one. A lawful insurable interest. I'm sorry, what? A lawful insurable interest? Correct. Counsel tells us that that would be an unlawful. No. There is not a single case he cites. He can say all he wants. But if you look at the briefs, there is not a single case cited which says there's no insurable interest if they're in default. And to the contrary, the cases say if you're in default, there is an insurable interest. The first case that says that is the Belger case cited in our brief. It's 37 Mishap. There's an insurable interest in the life of the debtor. And the United States Supreme Court, in the Connecticut Mutual Life Insurance case versus Lux, said an insurable interest existed even on a defaulted debt. In fact, there's a quote from the United States. It's in your brief. It's in my brief. And a quote from the United States Supreme Court. Upon this we have no doubt. The U.S. Supreme Court has no doubt that even if you're in default, even if it's not performing, you still have an insurable interest. I also cited to this court's decision in the International Life Insurance case versus Carroll, 17 F. Second 152. None of them was financially able to pay. What this court said, this interest, we think, is insurable. The court found it's insurable. And we cite it to more cases in our brief. Could you focus just a minute on the state of the record with respect to Mr. Siren's belief as to whether Mr. Ianni could pay? Absolutely. Mr. Siren submitted an affidavit that's unrebutted that says Mr. Ianni's business was about to take off when he died. In fact, after the default, Mr. Siren loaned, as the affidavit shows, the document showed, loaned additional money to Mr. Ianni after the $9 million, another $250,000. He obviously thought that he was going to get paid back, but he's not going to loan him more money. The business was taking off, and there's not a single piece of evidence anywhere. Look anywhere. There's no evidence that if Mr. Ianni lived, he wouldn't have the ability somehow to pay it back. And so your position is that if there's an inference that Mr. Siren did not believe he would be paid, it must be drawn from the fact that he had not been paid in the past. It's got to be drawn from something, but there's no evidence that he felt he would not be paid. He testified he felt he would be paid. The only thing in the record is that he had not been paid. That is correct. The evidence is he's not been paid, but the evidence is he believed he'd be paid because he loaned him additional money. And, again, whether or not he would be paid is not the issue in this case. There's an insurable interest, as the U.S. Supreme Court said, as this Court said, and as the State of Michigan said, as long as you, even if you're in default, that person's alive, he may have the ability at some point to pay it back. This man was an attorney who's finding a business that had millions of dollars invested into it. He was in his 50s. Plenty of time to live. Plenty of time to grow this new business. This was a beginning business that could have taken off if he was alive to do it. He wasn't alive, but that's why there's an insurable interest at the time. I want to just take two seconds before my time runs out to talk about interest, for just two seconds. The contract has a 10% interest provision. One, two. I'm sorry, what? It said one, two. Two seconds is what you said. Oh, I'm sorry. I didn't necessarily mean it that way, but the contract has a 10% interest provision. No, that's not an accurate prediction, was it? No, it was not an accurate prediction. I have one more sentence or one more question, never really turns out to be true, but a short period of time to explain about the interest. The interest is 10% under the contract. The extra 2% is because of the 12% statute, and the 12% statute is clear. It doesn't matter whether it's reasonably in dispute or not. There's a 2007 Michigan Court of Appeals case I cited that says it doesn't matter if it's reasonably in dispute. It's 60 days unless you're a third-party tort claimant. We're not a third-party tort claimant. Like any other statute, like any other defendant, you have a time period to pay, and the interest starts to accrue if you decide to do something afterwards. The contract doesn't contain an exception to the 10% saying, well, if we're still investigating. Mr. Ianni died in October of 2010. There is no evidence in this record anywhere that my client is a suspect, that my client was even ever a suspect. There's not a single piece of paper from the Novi Police Department anywhere. There's nothing in the policy or the law anywhere says that my client has to somehow get himself cleared of murder charges that's never been brought against him, and he's never even been articulated to be a suspect in order to get paid. To get paid, you have to do three things. You have to show the person died. You have to show he's a beneficiary, and Ms. Seale admitted that we're the beneficiary. The policy is clear. The sole beneficiary is Mr. Ianni. And that no impediment, and there's no legal impediment such as, you know, they talk about a number of things in the policy. None of which is murder. None of which is you're a suspect. None of which is any of these things. And it says it can't be something caused by them, ReliSTAR. ReliSTAR's been investigating for four years, and they found absolutely nothing. There's nothing in this record. But again, to go back and try to sum this up even before my time's up, it still goes back to some very simple, basic contract rules. ReliSTAR issued an insurance policy. That insurance policy says in more than one place, actually three, that any contest of a claim or any denial of a claim must be based upon a statement in the application. And there's not a single statement in the application that anyone says is false. All you heard him talk about is a letter to a different insurance company written a month before the application. It's not even in the underwriting file. He cannot get up and say there's a single thing wrong in the application. That contract must be construed against them. It must be binding. And even if the contract didn't say what it says, the law says the exact same thing. And the law adds one more element. The law adds materiality. And as each of you have tried to question, brother counsel, it's crystal clear that somebody's wealth does not affect their life insurance policy. They wanted to know about wealth to be sure that my client, Mr. Siren, could pay the bills. They took the money. They took the $140,000. They took the additional $70,000 in month payments, which, by the way, they never refunded, interestingly enough. They took the payments, but they haven't made the policy. The law exists for a reason, to stop insurance companies from trying to make up excuses to avoid payment. The law says it must be in the application. The policy says it must be in the application. It's not in the application. There's an insurable interest. We've submitted everything we have to. Judge Bertani went through this case in vivid, long, detailed initiative, very detailed, well-written opinion. I'd ask this court to affirm. If you have no further questions, I have nothing further that I need to add. Thank you for your time. Thank you, Mr. Ambassador. First, with respect to the notion that as long as there's nothing in my application that is false, I'm home free, that is not the law in Michigan. Titan Insurance Company says flat out, common law fraud is always a defense that can be raised. And, in fact, we sued not for statutory rescission under the statute cited by Brother Counsel, but under common law fraud theory, which Titan supports that notion. The fact that it was miswritten, the logical extension of that argument is, when the insurance company asks for the financial information before the application is submitted, you can lie through your teeth, you can submit phony documents, you can do all these things, but as long as the app is clean, the insurance company can do nothing. That is not the law in Michigan. The insurance company asked for those financial records? The insurance company said we need to understand the business relationship between these parties, because we're not just going to go out and issue a policy. Did they ask for those records you're talking about? They asked for a description of the business relationship between the parties and the evidence of the loan itself. They got back just the notes and a claim that he was paying 12 percent interest, which would presumably mean $90,000 a month of cash flow was going through. Is that in the application for the policy you issued, or are we still back in the pre-fraud policy? This is pre-any policy. I understand that. My point is that the fraud took place at the outset of this entire engagement that took about 30 days. What do you say about Mr. Weiss's point that this letter you're relying on is not in your underwriting file and these representations were made to another insurance company? Both of those statements are inaccurate. First of all, the statements were made— Where would we look in the record to find out? ING. Mr. Churchill's— No, no, where would we look in the record to determine inaccuracy? I sent this information— Where would we find your underwriting file in the record? The underwriting file is not a part of the record. He has a part of the underwriting file. The affidavit of Mr. Volz says this information was relied upon. That information was in fact submitted by Lee Churchill, the agent, to ING's underwriting department. It's in his deposition. It's just part of the record. You mean your underwriting file is not a part of the record in this case? The portion that he pulled out and said this is the underwriting file is his interpretation of what was relied upon by the company. What kind of file— We would not be able to find— If we looked in the record, throughout the record, at any point throughout the discovery, we would be unable to determine the basis on which you issued this policy? The basis upon which the policy was— I just want to know where to look. The affidavit of Mr. Volz says we issued the policy based upon the information provided, and we would not have issued it. I'm not interested in your take on it. I'm interested to know where we would look at the documents on which you relied as a part of your file, as a part of your business records, not as a part of somebody else's business records. I want to know how you just said that your client didn't give us the straight story on that, and I want to know for myself which it is. So where am I going to look in the record to find it? All I want to know is where I can look in the record. I don't want anything else. In the position of Mr. Churchill, page 24, he testified he sent that letter to ING. ING's underwriters is what he said. Okay. And that was before any applications were submitted. And Mr. Volz's affidavit, which is part of the record, says the company relied on the information provided to it. Do we have anything else for Mr. Ambassador? I have nothing else. We appreciate the argument both of you have given. We'll consider the case carefully. The clerk may call the next case.